We will hear argument first this morning in Case No. 10-1062, Sackett v. the Environmental Protection Agency. Mr. Schiff. Thank you, Mr. Chief Justice, and may it please the Court. Mike and Chantelle Sackett are here today because four years ago the Environmental Protection Agency issued against them a compliance order charging them with violations of the Clean Water Act, requiring that they restore their property to its alleged pre-disturbance wetlands condition, and imposing upon them the threat of tens of thousands of dollars per day in civil fines if they did not immediately comply with the order. But in these four years, the Sacketts have never been offered a meaningful opportunity for judicial review of the compliance order, an opportunity that they are guaranteed under the Due Process Clause and the Administrative Procedure Act. Scalia, of course, there would have been a daily fine with or without the compliance order, wouldn't there, if they were indeed in violation of the Act? Justice Scalia, the fine would only have been attributable to the statute itself. But with the compliance order in effect, essentially the Sacketts are now subject to double liability. They can be held liable for the statute as well as for actions inconsistent with the compliance order. So, Mr. Schiff, your understanding is that each day your clients are subject to $37,500 of fines for the violation of the statute and an additional $37,500 for violation of the compliance order. Is that the way you understand the penalty scheme to work? Yes. Yes, Justice Kagan, it is. And it is in fact, I might add, how the EPA understands the penalty provisions. In its brief at pages 30 and 31, they essentially concede that the existence of the compliance order does subject the Sacketts to liability for both violations of the statute as well as violations of the compliance order. But the Court of Appeals did say that there would be no independent liability under the for violation of the compliance order. That is, unless there was a violation of the statute, it would be no penalty for violation of the compliance order. That is correct, Justice Ginsburg. The Court held that as a predicate for any reliability for a compliance order violation, there must be first a finding of a statutory violation. But that doesn't change the fact, even according to the Ninth Circuit, doesn't change the fact that one can still be held liable for both, that there is a distinct civil liability that is traceable only to the compliance order. What kind of review are you seeking? I mean, the one thing you could say is you dispute that this property is subject to the Act. That might be a question that's reviewable. Do you seek more than that? Do you seek review at this stage of anything more than whether the property is subject to the Act? No, Your Honor. We seek review of that jurisdictional question as it is incorporated into the compliance order. The compliance order is the agency action for which we believe the sackets have a right of review under the Administrative Procedure Act. And our challenge under the APA to the compliance order is precisely that there is no jurisdiction and therefore there has been no statutory violation. Kennedy, tell me, what would be the scope of your holding? How would you write the opinion for the Court on this part of your case? What would the rule be? I mean, health inspectors go into restaurants all the time and say, unless you fix this, I'm going to give you a citation. Fire inspectors, the same thing. And I'm wondering how your general theory or your general principle that you want us to adopt would fit with that rather routine type of enforcement. Well, Justice Kennedy, we do not believe that what we are articulating extends as far as creating a right under the APA for review because a health inspector has come onto your property. All we are arguing is that the compliance order is a final agency action. It has stopped the sackets' home building. It has imposed upon them significant civil liability, and therefore they should have a right under the APA. Kennedy, this is under the APA. Correct. This is the APA problem of your view. Correct, Justice Kennedy. And we should emphasize that we believe that the sackets' due process rights can be satisfied by allowing their APA cause of action to go forward. It seems to me that there is another distinction, a more significant one, between routine inspections by fire marshals or restaurant inspectors, and that is that if you disobey their order, you are not subjected to any more substantial liability than you would have been subjected to had they not issued the order. It isn't the order that produces any new fine, is it? That is exactly correct, Justice Scalia. That's the principal distinction between the compliance order in this case and many of the agency actions that the EPA has set forth in its brief. What if the sanction imposed each day was not the $37,000, but was $10? If you don't comply, you know, we can bring an action any time to enforce this, and you will be subject to the statutory maximum. But during the period, the additional sanction for the under the administrative order, or the compliance order, is $10 a day. Mr. Chief Justice, I don't believe that would change the Court's finality analysis under Bennett. The fact that the fine is only $10 as opposed to $37,000 doesn't change it. But it might go to the adequacy of judicial review, the adequacy of the judicial review that would come when the EPA brings the enforcement action. I understood your argument to be that there was a significant extortion impact from the fact that these were such significant fines, double as you say, that you could rack up for 5 years. But if it's only $10 a day, that takes a lot of the wind out of your sails, doesn't it? Well, to begin with, Mr. Chief Justice, in addition to the independent liability that the compliance order imposes, there are other legal effects. Even if the compliance order had no independent liability, there are other legal effects that even EPA has conceded to. For example, the existence of the compliance order makes it materially substantially more difficult for the SACCOTS to apply for an after-the-fact permit, a higher to apply for a For an after-the-fact permit. Once a compliance order is issued, an after-the-fact permit can only be applied for under the clearly appropriate standard in the core's regulations. But, Mr. Chief Justice, in response to the question, yes, of course, the amount of the fine certainly factors into meaningfulness of review. It factors into coerciveness. But even if there were no fines, there is, attributable to the compliance order, there is still the fact that the SACCOTS cannot independently initiate, cannot trigger review of the compliance order. Scalia What do you care? I mean, you have the fines, don't you? So why don't you just argue that? Why do we have to wrestle with the more difficult situation where there are no fines? It's conceded that there are fines, isn't it? That's correct, Justice Scalia. So, you know, sufficient unto the day the evil thereof. We don't have to consider more difficult cases. But as I understand it, you can get review by applying for an after-the-fact permit from the core, and the only expense you would incur in order to get that would be to fill in as the order requires you to do, which is something like, what, $27,500 or so? Well, Justice Scalia Is that such a hard hit? That's a lot less than, you know, $37,500 a day. Well, the difficulty, Justice Scalia, is that the SACCOTS cannot obtain judicial review of the compliance order within the context of the permitting process. The compliance order is the order that has caused the deprivation that is imposed upon the SACCOTS, this double liability. Well, but their challenge to the compliance order is simply that they don't have wetlands. It's the jurisdiction of the EPA. And surely that can be raised before the Corps of Engineers, no? That issue might be raised, Your Honor, but the SACCOTS could never get review of that issue within the context of the compliance order, which is, of course, the agency action that has caused their harm. Moreover, there is, frankly, no guarantee that the SACCOTS could even get into court through the permitting process, because the Corps might very well say, well, you know, we don't believe that there are wetlands on the property, and so we're not going to issue you a permit, and therefore, there is nothing for the SACCOTS to then litigate over in Federal court. How long does it take to get one of those after-the-fact permits? There is a study, Your Honor, in terms of averages. I think it's about a year. But there is nothing in our record that would show necessarily that the SACCOTS are eligible for a nationwide permit. But more importantly is the fact that the permitting process doesn't provide review of the burden of the deprivation that the SACCOTS are enduring right now. Roberts I don't understand what exactly you might get from the Army Corps of Engineers. Obviously, they might give you a permit, and I take it that cuts off liability. You can do what you're hoping to do. They might say you don't get a permit because these are wetlands. Can they do something in the middle, which is kind of hard for us to tell? You're on your own? Very much so. In addition to saying we're not going to issue a permit because we don't believe there are wetlands on the property, they could also say under the regulations that even EPA cites in its brief that we're not even going to entertain your after-the-fact permit application while the compliance order is still outstanding, meaning that you will likely have to comply, be fully deprived with everything the compliance order says, allowing EPA onto your property, requiring significant expensive restoration of your property to its alleged wetland state before you even have the privilege of applying for a permit. Kagan. Is that what's critical, Mr. Schiff? If that were not true, if you could go in, even with the compliance order on your property, and get an adjudication of whether you had wetlands in the context of an after-the-fact permit proceeding, would that be sufficient? No, it would not, Justice Kagan, because, again, the fact is that the compliance order is, well, the permitting process is an entirely separate agency action. It's an agency action that the Army Corps goes through. The SACCOTS could get no review of the compliance order. Well, why does that matter? You're getting review of the question that you care about, which is the question whether you have wetlands on your property. And if they said you don't have wetlands on your property, here's a permit, your problems are finished. Justice Kagan, the difficulty is that that judicial decision would have no impact and would not remedy the deprivation that the SACCOTS are currently enduring. Do they issue permits when there are no wetlands? I thought it was a permit allowing you to do something on wetlands, which otherwise would not be allowed. That's correct, Justice Scalia. So if they decide that there's not a wetland, what do they do? They do nothing? That's my understanding. The Corps would simply say there's nothing to permit because there are no wetlands to fill. But the difficulty is that there are no wetlands. Kennedy, but then the compliance order would automatically be vacated? I mean, doesn't the compliance order presume that there are wetlands? Hasn't the agency already made that determination? The difficulty, Justice Kennedy, is that we're talking about two agencies. And this is really the why, one additional reason why the permitting process is an inapt solution to the SACCOTS problem. The SACCOTS have been injured by EPA by the compliance order. And now the SACCOTS have been injured by EPA by the compliance order. Alito, that underscores how bizarre it is to force the SACCOTS to go through a process. They've been injured by the EPA by a compliance order. And they're told they must initiate an entirely separate administrative action with an entirely different agency in order to get indirect, tangential, possible review of the compliance order that has turned their world upside down for the last four years. The — that is why the permitting process cannot provide meaningful judicial review to the SACCOTS. That's why the Administrative Procedure Act is the ready-made answer. And frankly, there's no indication that Congress intended anything other than the Administrative Procedure Act to provide an adequate administrative review for the adjudication of compliance. Ginsburg. What would the standard be before you have EPA review? So it's just that the EPA acted reasonably in determining that you have wetlands? Yes, Justice Ginsburg. It would be your typical arbitrary and capricious standard of review, substantial evidence based upon the record that was before the EPA, when it made its finding of statutory violation, which is the statutory predicate for the issuance of the compliance order. Scalia, surely you wouldn't go in and try to fight arbitrary or capricious. It's arbitrary or capricious or otherwise in violation of the law. Wouldn't you go in and say that this is in violation of the law? No, exactly, Justice Scalia. I mean, I don't mean to limit ourselves to just that one standard of review, but it would be a judicial review. I don't think that one standard of review would do you very much good, to tell you the truth. They've thought about this. Maybe they got it wrong. But to say it's arbitrary or capricious, you're going to lose. Well, I certainly hope not, Justice Scalia. But the difficulty is we don't even know at this point what sort of record the EPA has. In fact, the law as it stands now is that EPA doesn't even need probable cause  And the fact that it's arbitrary or capricious is a very difficult time to show. Alito, given the rather vague nature of the test that's been adopted for determining whether something is part of the waters of the United States, wouldn't you have a very difficult time? There's no question, Justice Alito, that there is, yes, it would be a difficult time. But that, just because the Sacketts might have an uphill battle, I don't believe there's any reason to say that they should have no opportunity. I mean, as it stands now, they've been told you cannot build your home, you must convert your property into wetlands, and you're being charged $37,500 per day if you don't immediately comply, and yet you get no day in court. And, Mr. Schiff, is the way you see this operating, that you bring an action contesting on the basis of the Arbitrary and Capricious Clause or otherwise not in accordance with law, if then the court rules against you, but you continue to fail to comply, does the EPA then have to bring a separate enforcement action? Yes. The only way EPA can actually take money away from the Sacketts is by filing a civil action, but that would be true whether or not the Sacketts bring an APA cause of action. Would collateral estoppel apply to you because of the judicial determination on the compliance order in the subsequent enforcement action? In other words, you lose, you seek APA review, and the court says, you know, we think it's a wetland, and then the EPA brings an enforcement action. They have to establish it's a wetland. Don't they just attach a copy of the decision? Well, not necessarily, Mr. Chief Justice, because, for one, the standard of review would be different. It would be, under the APA, it would be the traditional deference afforded to agency action. Well, not – I guess I'm back to Justice Scalia's question. It struck me as a purely legal jurisdictional issue. Are these wetlands or not? And I don't know why you would get deference to the agency's determination on a legal jurisdictional issue like that. No, you're correct, Mr. Chief Justice. I mean more in terms of the substantial evidence standard that usually supports agency action under the APA. But certainly here, the Sacketts also contend, regardless of questions of Rapanos and connection to navigable waters, the Sacketts contend that there are no wetlands at all on this property. And that ultimately is, of course, a factual question that would be informed by what's in the record. But to go back to the Chief Justice's question. Kennedy, if they're wrong about that, if there's a finding in the APA process that these are wetlands, is that the end of it? Or within that, the context of that review, can you say, well, they're wetlands but only to a minor extent, and these conditions were onerous and far more than necessary to protect the wetlands? Can you argue that in the APA review? Or is it just up or down? Wetlands you lose, not wetlands you win. That's it? No. I mean, Justice Kennedy, we would argue that even if there are wetlands on the property, which we do not believe there are, that the compliance order would still be invalidated if there were not a significant nexus between the alleged wetlands on the property and some navigable water in the vicinity. But, but. Sotomayor, who would review that and where? Going back to Justice Kagan's question of let's assume you went through an APA process and they found it was wetlands and that the compliance terms were at a substantial nexus. What happens when you go into an enforcement action? Well, at that point, then, both sides get to create a new record consistent with what the Ninth Circuit held. That's. So the Chief Justice's suggestion that there would be preclusion you do not agree with. No. In addition to the fact that the standards of review would be different, preponderance of the evidence in a civil action as opposed to substantial evidence in the APA, it would also be the fact that, that even as the Ninth Circuit understood a civil action, when it goes forward, both sides have an opportunity to create a new record or to establish by preponderance of the evidence the elements of the civil action of the offense. So does anything get estoppel? I'm sorry, Justice. Does anything get estoppel? Assuming it's not a legal question, would the factual findings that there's a substantial nexus between the remedy ordered and the violation, would that get estoppel? It would be difficult to imagine a case of estoppel because, again, in the APA context, it's just based upon the record of the time the compliance order is issued. And so the records are always going to be different because the civil action will build upon that administrative record. And then, secondly, in terms of the differing standards of review, I suppose one could find a purely factual question, perhaps, that where the standards of review wouldn't matter, or a purely legal question. But this would be a problem if this procedure were not employed, if there were not this prior compliance order that issues before actual suit by the EPA to hold you liable for violating the act. Then you just have one suit, and the issue would be clear as to what burden the agency has to sustain. Scalia, but it's really the dual nature of this process that creates the difficulty, isn't it? Yes, Justice Scalia, to some extent it is, of course, the process that Congress But that's in the statute. The agency would make that up, right? The statute provides for compliance orders, and it calls them compliance orders, doesn't it? It does indeed. And so even if the sackets on remand don't get their ideal mode of judicial review, something is frankly better than nothing. They have been told for four years they cannot build their home. They have been threatened with ruinous civil penalties. And to date, they have had no opportunity for their day in court. The sackets cannot trigger an enforcement action. I mean, perhaps if Congress had written the statute differently to allow for some sort of judicial review that the sackets could initiate for a compliance order, that might answer, Justice Scalia, your concerns. But that is not the statute we have. We have a statute where Congress has said EPA can issue a compliance order, and we have in combination with that the presumption in favor of judicial review of final agency action. We have the avoidance canon, all that point to allowing for the sackets to get their day in court, and at the same time to satisfy and to vindicate Congress's intent. Congress wanted EPA to be able to issue these compliance orders. Congress gave significant statutory penalties for violating these compliance orders. But at the same time, there has to be balance. One cannot tell landowners, of course, you know, you are not going to be out of the woods. Even if you get this APA review, okay, some of the factual questions that go to whether these are wetlands or not are going to be decided, giving substantial deference to the agency's determination of the facts, right? No, that is correct, Justice Scalia. And so even if you lose on that, you might still think you can win when the EPA finally brings a civil action seeking to impose a penalty, where the burden will be on the EPA without any deference to its fact-finding. So you still won't know where you are, will you? You've lost one, but you may win the other. You'll have to roll the dice. Well, it's – respectfully, Justice Scalia, it's more than rolling the dice. It's subjecting the sackets to an interminable Damoclean sword. If the only way they can get review is simply waiting, well, when will EPA let the sword drop and bring a civil action to enforce this compliance order? Who knows how old it is? With EPA's theory of continuing violation, the statute of limitations never even runs. And so you have the sackets who are forever subject to this cloud over themselves, cloud over their title. They can't get anyone to come onto their property to build their home. Ginsburg. Is there no limitation on the compliance order? It just – it can be there forever until the EPA decides to bring an enforcement action? As EPA – Justice Ginsburg, as EPA interprets the statute of limitations for collecting civil penalties, so long as the discharge, quote, unquote, remains in place, it's considered a continuing violation. And so the statute of limitations never even begins to run. And so the sackets might be – might build their home in 10 years down the road, be surprised that here comes EPA with its civil action. Oh, now the sackets get judicial review, but at a significant cost. They can't even enjoy the home that they might build because there is always this cloud hanging over them, a cloud that can be dispelled if they can simply have an opportunity. Obviously, it may not be the best opportunity, but something is better than nothing an APA cause of action to review the EPA's assertion of its authority over their property. Ginsburg, I asked you earlier, in this APA review, would there be any further question after the determination, is it wetlands, is it not? And you had said no, that's – that would be it. But you answered another question that would suggest it may be wetlands, but it shouldn't – there should be – you should be allowed to build your home anyway. Well, allow me to clarify, Justice Ginsburg. In this APA cause of action, the sackets challenge the jurisdictional predicate, and that is really a two-part determination. One is, are the wetlands on the property? And two, are those wetlands sufficiently connected to navigable waters to justify Federal regulation? And both of those fit into our first claim for relief, our APA cause of action. And so in this case, that is what our APA cause of action on remand would look like. We would say, let's look at the – at the record that EPA has assembled at the time it issued the compliance order, and does that record support the finding of statutory bias? Sotomayor, you're conceding that the compliance order, assuming there is a violation, is all right? You're not challenging any of the terms of the compliance order other than the finding of a violation? That is correct, Justice Sotomayor. Yes, that is correct. That is all that we are challenging. Mr. Chief Justice, if I may reserve the balance of my time. Thank you, counsel. Mr. Stewart. Mr. Chief Justice, and may it please the Court, I'd like to begin with the question of double penalties, because I think it helps to clarify exactly what the compliance order does and does not do in terms of altering the legal regime to which the SACOTs are subject. The compliance order is intended to specify the violation that EPA believes to have or believes are necessary in order to achieve prospective compliance. And the statute does provide separately for penalties for violating the statute and penalties for violating the compliance order. And as an exercise of our duty of candor to the Court, we acknowledged in our brief that the government reads the statute to allow the legal possibility of double penalties, that is, up to $37,500 per day for violating the statute, up to $37,500 per day for violating the compliance order. I think that's really a theoretical rather than a practical. Breyer, why do you say practical? The order itself says that. It says if you don't do it, you're going to get penalized up to 325, which is now 37. Well, that language in the order would have been accurate even if the statute didn't authorize penalties for violating the order itself. That is, even if the statute authorized penalties only for violating the Act, it would have been accurate for EPA to say, we believe this is what is necessary to achieve compliance, and if you don't do it, you will potentially be subject to these civil penalties, namely civil penalties for violating the statute. But the reason I say that it's the double penalties is a theoretical possibility – let me say that again. If there were no provision for penalties for violating the compliance order, only penalties for violating the statute, EPA could accurately have said, we believe that the following steps are necessary in order to achieve prospective compliance with the Act, and if you don't do these things, you will be subject to the following penalties, because you will then be in violation of the Act, and you will be subject to the penalties. Roberts, I don't follow – I didn't follow that. What is your response to the assertion that you're subject to double penalties? One for violating the Act, two for violating the compliance order? The first is, it is a legal possibility. We're not aware of any case in which a district court has ever imposed penalties of greater than the 37,000. Roberts, you don't doubt that they have the authority to do that. They have the authority to do that. I guess the other thing I would say is the possibility that penalties would be increased doesn't distinguish this scheme from the sort of regime that Justice Kennedy referred to or the sorts of regimes that we've discussed in our brief. That is, it's very common for law enforcement agencies of all sorts to give warnings to regulated parties, we think you're violating the statute. Sotomayor, given – I'm sorry. Roberts, Justice Alito. Has the United States adopted a rule or announced a policy that it will never seek anything more than the penalty for the underlying violation? It will not seek an additional penalty for violation of the compliance order. We have not adopted a policy to that effect. And I guess what I do want to clarify is – It's more than theoretical, then. I don't really understand what you're saying. You're saying that we may ask for more, but it's unlikely courts will actually provide for more. I guess the two – I don't know that we have ever asked for more than the 37,500 per day. Now, I think it is often the case that what district courts will do is within the 37,500 statutory maximum, they will say we are imposing a greater penalty for the period after the compliance order was issued because it shows greater culpability to continue with the violation after you've been warned. But that's not a feature of the compliance order that distinguishes it from all manner of other agency warnings. Scalia. Your order could have read, it could have read, notice is hereby given that violation of or failure to comply with the foregoing order, capo, may subject Respondents to one civil penalties of up to 32,500, now 37,500 per day. That's how it reads. It could have read violation of or failure to comply with the Environmental Protection Act may subject Respondents to civil penalties. It's quite specific that it is violation of failure to comply with the foregoing order, which includes not letting – filling in immediately and so forth. It says what it says. It's the violation of the order that the additional penalties are attached to. Stewart. And again, we don't dispute that violating the order could as a realistic matter cause the penalties to be greater within the statutory maximum. But as I was saying, in many situations, agencies give warnings to regulated parties, if you keep doing this, you may be subject to penalties. Scalia. It could, as a theoretical matter, double the penalties. Stewart. That's correct. Scalia. You're just saying as a practical matter, it doesn't often do that. Stewart. As a practical matter, we are not aware of any case in which the penalties imposed have been greater than the per day statutory maximum for the violation. Scalia. I'm not going to bet my house on that. Stewart. It seems in terms – I think first of all, we would say that until we floated this theoretical possibility in our opening brief, the Sacketts seemed to be entirely unaware of it. That is, all of the Sacketts' calculations as to the penalties to which they would be exposed if they continued to engage in their present conduct were premised on the idea that 37,500 was the statutory maximum. But the main point I want to make is that the Sacketts' calculations were premised on the idea that 37,500 was the statutory maximum. The point that the one thing the Sacketts have never argued is, if it were just the 37,500 per day for violating the statute, we would be willing to build our house and take our chances, but once you double that, we're not willing to take the risk any longer. And that's not their argument today either. Right. The one point before I move on that I do want to make clear is, in a wide variety of contexts, agencies will issue warnings to regulated parties that they are believed to be in violation of the statute. And it is common under schemes where the amount of the sanction is up to the judge's discretion that penalties will be greater for conduct that occurs after the person has been warned. Sotomayor, but those situations are slightly different, because the Act doesn't specify any specific remedies that apply to any specific property. It just says you violate the Act by filling in wetlands. It doesn't say that you violate the Act by not removing the fill and not planting trees and not doing this or doing that. What it says is you violate the Act if you don't comply with the compliance order that tells you to do those things. So it's a very theoretically different violation that's going on. One is in the affirmative act prohibited by the statute. That's the violation of the statute. And the other is the violation of the remedial steps that the compliance order is the only thing that has set forth. I don't think that that's correct, Your Honor. First, as to the requirement in earlier versions of the compliance order that plant or herbaceous plants be planted, et cetera, those were removed from the statute. Sotomayor, but those are not in the statute. They're permitted by the statute, but they're not set forth as requirements under the statute. EPA's view of the statute is that without regard to the issuance of a compliance order, once fill material is deposited in waters of the United States, EPA's view of the penalty provisions would be that the violation continues for as long as the fill remains in the wetlands. Sotomayor, that has nothing to do with the fact that the Act doesn't specifically tell you to remove it. The Act doesn't specifically and the Act doesn't specifically tell the person to remove it, but that's our interpretation of the statute. And it's either right or wrong. That is, if we're wrong about that, if the only days on which penalties can be assessed for violating the statute itself are days on which fill was actually discharged, then the provisions of the compliance order that directed the Sacketts to remove the fill and restore the property would be beyond the scope of a proper compliance order under 136. Roberts, you referred a couple of times recently to the EPA's view of the statute. I take it that's your view as well. That's our view as well. I'm just saying that hasn't been definitively resolved by this Court. But the position that we've taken, again, with respect to the statute itself, is that in computing the daily penalties and asking how many days of violation were there, the district court should take into account not just the days on which fill was actually deposited, but the days on which fill remained in the wetlands. And Petitioners have specifically expressed agreement this morning with that view of the statute. I think the view of Petitioner's amici is to the same effect, because in many of the cases there are calculations of the very large penalties to which people could be subject if they didn't adhere to compliance orders. And they're all premised on the idea that every day fill remains in the wetlands. Scalia, what about those provisions of the original order? I must say, I was not edified by the fact that when litigation was threatened or actually brought, the EPA modified its order. Oh, you don't have to plant the trees. Does it do this as a matter of practice, issue compliance orders that go well beyond what the EPA would demand? I don't know about well beyond. I think every version of the compliance order said to the sackets, if you think that there are things here that are in here that are wrong or compliance measures that you regard as infeasible, you're welcome to tell us. And I think that's very nice. That's very nice, when you've received something called a compliance order, which says you're subject to penalties of 32-5 for every day of violation. I think the portion of the order dealing with the planting of plants, which is the primary one that was eliminated in the final iteration of the order, is really removed from what the sackets have been complaining about. That is, the sackets confirm that there are things that are in here that are inappropriate. Nobody chose the high-handedness of the agency, it seems to me, putting in their name stuff that is simply not required by the EPA. Well, I think in the main, what the every version of the compliance order required was appropriate, if you accept the initial determination that there was a violation that these were waters of the United States. What would you do, Mr. Stewart, if you received this compliance order? You don't think your property has wetlands on it, and you get this compliance order from the EPA. What would you do? Well, as we know from documents that have been provided to the EPA, they are not in the record of the case. If they weren't in the record, I don't want to hear about them. You appreciate that rule, that we don't consider things that aren't in the record. You get a compliance order. You don't think your property has wetlands. What do you do? I think at that stage your options would be limited. You could apply for an after-the-fact permit. You wouldn't do that, right? You know you would never get an after-the-fact permit if the EPA has sent you a compliance order saying you've got wetlands. Or you could simply comply with the compliance order at the cost of, it's been estimated, $27,000. Once the compliance order has been resolved, there would be no further impediment. That's what you would do. You would say, I don't think there are wetlands on my property, but EPA does, so I'm going to take out all the fill, I'm going to plant herbaceous trees or whatever it is, and I'll worry about whether to do that way. I'll just do what the government tells me I should do. It may be that the Sacketts at that point were in an unattractive position, but I think in determining whether it's an unfair position or how the statutory scheme is supposed to operate, we ought to look not just at the opportunities that were available to them at that moment, but the opportunities that they had foregone already. And it's a story that if you related the facts of this case as they come to us to an ordinary homeowner, don't you think most ordinary homeowners would say this kind of thing can't happen in the United States? You don't you buy property to build a house. You think maybe there's a little drainage problem in part of your lot, so you start to build the house. And then you get an order from the EPA which says you have filled in wetlands, so you can't build your house, remove the fill, put in all kinds of plants, and now you have to let us on your premises whenever we want to, you have to turn over to us all sorts of documents, and for every day that you don't do all this, you're accumulating a potential fine of $75,000. And, by the way, there's no way you can go to court to challenge our determination that this is a wetlands until such time as we choose to sue you. Stewarts. Well, the first thing I would say is, as a matter of standard EPA practice, the compliance order would not be the first communication from the agency that would alert the land owner to the belief that there was a violation. The record in this case does not make clear whether that agency practice was followed in this case, but EPA's typical practice is to alert landowners through prior communications that a violation is existent. Alito. Well, so what? Somebody from the EPA says we think that your backyard is a wetlands, so don't build. So what do we do? What does the homeowner do? Once that property, well, all right, I'm just going to put it aside as a nature preserve. At the time that that sort of letter is issued, there's no compliance order and there's no impediment to an after-the-fact permit. That is, at that point, the landowner could ask for a permit. Roberts. In other words, what the landowner is supposed to do, the agency says, because you didn't apply for a permit, you're in trouble, because you didn't give us a chance to say whether we were going to take away your constitutional rights or not, so we can do it. Well, the first two things I would say, the first thing I would say is it's not simply a hypothetical means of challenging CWA coverage to seek a permit. That is, in both Swank, Solid Waste Agency of Northern Kirk County, and Carabelle, which was one of the two companion cases that this Court adjudicated in Rapanos, that was the way that the suit got into Federal court. The landowners applied for permits, they were denied, they sought judicial review of the permit denials, and argued inter alia that there was no need for a permit because the relevant tracts were not waters of the United States. The second thing I would say is it's often the case that judicial review is contingent upon complying with some sort of deadline or some sort of prerequisite. And once a person has missed the deadline, that person may, as a practical matter, be in the same position as if judicial review had not been made available at all. Scalia, Suppose the Corps of Engineers agrees that it's not a wetland, and its basis for refusing to issue the permit is, we don't give a permit, you don't need a permit. It would issue a letter either to the effect that there was no wetland or that it was a wetland that was not covered by the Clean Water Act. Is that binding on the Environmental Protection Agency? Yes, we would. Breyer, how can they bring an action? I'd like some clarification here. The Corps' regs say the Corps will accept an after-the-fact permit, I mean one after. If they applied tomorrow, at the day after getting this order, you'd run up against the reg which says we won't give you any after the fact, we won't even consider this matter until any required initial corrective measures are made. And then, just to be safe, they say that no permit application will be accepted unless the Corps determines that concurrent processing of an after-the-fact permit application is clearly appropriate, clearly. So I looked at those two things and said, of course you can't apply to the Corps of Engineers, they're not going to accept it unless you have a very unusual case. I expect you to tell me why I'm wrong about that, if I am, or how many after-the-fact permits applications has the Corps of Engineers accepted? Maybe there are a lot. It's not precluded, but I would agree with you. It's very unlikely that without complying with the order. Okay. Right. I agree. Then if we agree, then, look, for 75 years, the courts have interpreted statutes with an eye towards permitting judicial review, not the opposite. But, and yet, so here you're saying this statute that says nothing about it precludes review, and then the second thing you say is that this isn't final. So I read the order. It looks like about as final a thing as I've ever seen. So tell me why I'm wrong on those two points. Well, we're not arguing that the statute precludes all judicial review. That is, the question whether the Clean Water Act applied to this tract could have been teed up for a court in either of two ways. If it doesn't, you're on the final part. You are arguing that the presumption of reviewability does not apply. To this particular order. And that seems a very strange position. Why would the presumption of reviewability not apply? I think first because the order doesn't express the final, the agency's final view, both in the sense that it invites the sackets to provide further comment. They asked for a hearing. Didn't they ask EPA for a hearing on whether their lands fell within the statute? They did ask for a hearing, and the EPA said no. EPA said no to a formal hearing, but I think that would be characteristic agency practice. That is, when the agency is exercising what is essentially its prosecutorial function, that is, warning regulated parties, we may do, we may sue you if you don't do the following things. It would be quite common for enforcement personnel to entertain informal overtures from the regulated party or his legal representative. But I think it would be extraordinary, for instance, for a U.S. Attorney's office to grant a formal hearing to a potential criminal defendant in order to discuss the, in order to resolve the question, criminal charges should be brought. Ginsburg. There's one thing I do want you to tell us, is EPA has three choices. It can go with the compliance order, it can issue an administrative, trigger an administrative penalty where there would be APA review, or it can bring an enforcement action. How does the agency decide which of those three routes it's going to take in a given case? I think the admin, the agency's normal practice would be to issue an administrative compliance order before initiating judicial proceedings. That is, the statute doesn't require it, but the EPA ordinarily would not commence a lawsuit without first giving the regulated party one final opportunity to come into compliance. Now, what about this administrative order, that the administrative order with, internally with any EPA subject to judicial review, when does it use that as opposed to a compliance order? It could use that. It would typically use that for violations that it perceived to be less serious. The statutory cap on penalties is much lower than the cap in the judicial enforcement actions. I think it would probably be the case that it would issue an administrative compliance order in those situations as well. Now, one of the things that the administrative, the cover letter to the administrative compliance order does say is even if you comply, you are still not immune from the possibility of enforcement proceedings with respect to past violations. And I think that's the case. Scalia, can the EPA issue a warning instead of using this order procedure, compliance order procedure? Absolutely. I mean, there is no express statutory authorization for that, but I think most agencies regard it as within their ordinary authority to enforce the statute, to send less formal complaints. So they could just dispense with this compliance order and tell the Sacketts, in our view, this is a warning, we believe you are in violation of the Act, and you will be subject to, you are subject to penalties of 37-5 per day for that violation. And to remedy the violation, in our judgment, you have to fill in and you have to plant, you know, pine trees on the lot. It could do that. They could use the letter for that mechanism, and there would be no review of that. We would certainly argue there would be no review of that. And if the Court said that there was review of the administrative compliance order based on features that were distinct to the order, namely the fact that it is an order, the fact that penalties can be imposed for violation of the order itself, an opinion along those lines wouldn't suggest that. Breyer. Is there anything you got by it? I mean, you have got me now into the area. We are applying the APA, and the question is Abbott Labs, and is it final? Well, here there doesn't seem anything more for the agency to do, and here the person whom the order is directed against is being hurt a lot. So the only thing I left in my mind here is the order itself does say that the order is final. Come in and talk to us about this, which may suggest it isn't final. So do you have any information on that point? That is, have you looked up or has the APA told you that really when we issue these things, in fact, people come in and we modify them X percent of the time? We don't have statistics about that. Now, any impression that you could tell us? I would have the impression that it's in a nontrivial number of cases the landowner does approach EPA. Now, it's do that. I will say that the statistics I do have are that only a very small percentage, you know, a rough estimate somewhere on the order of 3 percent, of wetlands-related compliance orders under the Clean Water Act ultimately culminate in lawsuits for enforcement. But that would encompass both the cases in which the landowners came in and talked to EPA and those in which they just complied. I'm sorry. Mr. Stewart, you suggested that some communication occurs before this compliance order. And my guess would be that most of the back and forth between the agency and the person does happen before the compliance order rather than after. And the notion that the person can come in after the compliance order and say you were wrong, well, they can, but they can do that with respect to any administrative action. So am I wrong about that, that really the back and forth here takes place before the compliance order issues rather than after? I mean, I think you're right as a matter of typical agency practice that there would be an invitation well before the compliance order was issued to come in and give your side of the story. And you're probably right that if we got to the point where a compliance order was issued, then the likelihood that further communications would sway the agency substantially might be reduced. So I would take your point there. I'm sorry. Finish your answer, then. So, yes, I would agree with that. Sotomayor, you were cut off. You were saying if we were troubled by the additional penalties, and you were going to suggest something, if we were troubled by that aspect of the order alone and you haven't dealt with the permit issue after the fact, what would be your approach to the case then? Well, I guess the two things, one of which may be more troubling rather than less troubling, is to say that if you're troubled by this, then there are a lot of other things that might be troubling as well, because it's often the case that warnings are issued to regulated parties, and it's often the case that if the regulated party continues with the conduct after receiving the warning, the penalties may be enhanced. This is not a warning. I mean, you only have to look at it. I was quite moved by the fact when I looked at it, it didn't say a warning. It said this is an order. It looks extremely formal. I even overstated in your favor the question of negotiating, because it doesn't say negotiating about changing the order. It says negotiating about amending the order. And so this is not just a warning, is it? It is not. It is phrased as an order, but the only thing that EPA is authorized to do under Section 1319a3 is to order people to do what they were already legally required to do. That is, order them to comply with their legal obligations. Scalia. Can't you usually obtain a declaratory judgment if prosecution is threatened and you think that there is no basis for it, and you can't you're not compelled to just stand there and wait for the prosecutor to drop the hammer? Can't you normally bring a declaratory judgment action saying there is no basis for prosecution? There is no – the Court has held that there is no constitutional bar to that and that the declaratory judgment remedy can be made available in that circumstance. But again, I think it would cause a huge upheaval in the practices of many agencies to say that declaratory relief is typically available when the agency issues an informal warning. Scalia. Well, maybe with an informal warning, but when you have something as formal as this which shows that the agency does intend to prosecute, why wouldn't you be able to bring a declaratory judgment action? Again, I don't think that there would be any value to agencies or to regulated parties to encourage the agencies to hedge their bets or to say less than what they really mean. That is – That's what I'm trying to get you to talk about, just for one minute. I mean, you're talking about huge upheaval. My honest impression is that it is the government here that is fighting 75 years of practice because the issue is the Abbott Labs issue of finality. And of course a warning isn't reviewable. But this seems to meet the test where that fails. Now, please correct me if I'm wrong about the agency practice. I can't find support for your argument. The Court in Abbott Labs emphasized that that was an industry-wide regulation, having the force of law, and that the basis for challenging it was a purely legal ground. And one of the reasons that we think judicial review of the administrative compliance order within this scheme would make no sense, would be out of keeping with the rest of the statutory regime, is that it wouldn't solve the problem. As the discussion in the first part of the argument made clear, Petitioners share our view that the administrative compliance order would be subject to review if it's reviewable under a deferential standard. And if the Court held that the order was not arbitrary and capricious, that still wouldn't eliminate the possibility that if we pursued an enforcement action, the Petitioners could argue that they weren't actually in violation. Ginsburg. How would it work? You say it's less astounded under the APA. But the question is, is this wetlands or is it not? It's more than just is it wetlands. It's are these wetlands that have the requisite connection to traditional navigable waters. And that can turn in part on factual and scientific judgments. And if those are the ones that have the requisite connection to natural navigable waters. Ginsburg. But as far as the EPA is concerned, they're finished with that question. This is not something that when we might look at it again tomorrow based on new evidence, the determination that these are qualifying wetlands, that has been made. I think they have reached that conclusion for now. I don't think it would be accurate to say that we have done all the research  And that's really the second half of the problem, that if Petitioners' claim were reviewable and a court held EPA didn't do sufficient investigation based on the record before at the time, there was no sound basis. That makes the EPA's conduct here even more outrageous. We think now that this is wetlands that are, that qualify. So we're going to hit you with this compliance order. But, you know, when we look into it more thoroughly in the future, we might change our mind. I would assume that any prosecutor, any enforcement person, would want to be better prepared when a case actually went to trial than when he was communicating to the potential defendant that there's a real likelihood that we would sue you. But the other part of the problem is that we're not going to do that. Sotomayor But you're required to make a finding that there's a violation. You're not suggesting that the government's going to act willy-nilly and it's not going to act on sufficient evidence in sending a letter that says, we find you are violating the act. Obviously, we would feel that we had sufficient evidence for doing that. But the second part of the point that I was going to make is, even if a court found that we didn't have sufficient evidence before us at the time the administrative compliance order was issued and that the order was, therefore, arbitrary and capricious, that wouldn't provide the SACCOTS the protection that they needed, because that wouldn't foreclose EPA from. Robertson That's right. In other words, you hope you have, you've looked at it, you hope you have a sufficient basis, and because of the administrative compliance order, you're really never going to be put to the test, because most landowners aren't going to say, I'm going to risk the $37,000 a day. All EPA has to do is make whatever finding it wants and realize that in 99 percent of the cases, it's never going to be put to the test. Stewart I guess the only point I would make is, if Petitioners had wanted a judicial resolution of the coverage question without subjecting themselves to potential penalties, they could have filed a permit application before discharging, they could have gotten review there. All we're saying is they can't discharge, fill, wait to see whether EPA notices, and then insist upon immediate judicial review if EPA notices and objects. Roberts Thank you, counsel. Mr. Schiff, you have 4 minutes remaining. Schiff Mr. Chief Justice, unless the Court has any additional questions. Breyer I do, actually, because I see their point better than I did. This, I think, is what they're worried about. They're worried that when you get judicial review of this kind of order, the Court doesn't refer on fact-finding that isn't made on a record. The substantial evidence test applies to fact-finding made on a record, or 556, 557. And so they'll have a hard time, or a harder time, in each of these cases, subjecting it to judicial fact-finding. And they think that the purpose of this, the purpose of this procedure given to them by statute, was to call it the shots in favor of them, because there might be thousands of these things and they can't prepare all that formal thing. I see that as a, as a, now I understand their concern. I'm not saying they're right, I understand their concern. So if you want to comment, is there some way to accommodate their concern that also accommodates judicial review? Or are we just in a kind of they're in a Hobson's choice, in a sense? Well, Justice Breyer, the difficulty is, is essentially of EPA's own creation. I don't understand why, why EPA would want the power to issue compliance orders that, as the Court has recognized, are, are tremendously coercive and not have a. They want the power because they have thousands of these things. They investigate it and they find the facts. They think it's sufficient. But judicial fact-finding is carried out before a judge who doesn't have their experience, et cetera. And therefore, there is a risk of incorrect decision-making, at least to, under the statute, it would be to pro-homeowner rather than to pro-environment. That's why it's more of a dilemma than I thought. I think, Justice Breyer, the, the fear of it being to pro-homeowner is, in fact, protected by the fact of the APA standard of review. We're not talking about, about the, the agency being forced to sort of a, a, a. Scalia Yeah, but maybe the agency is only entitled to deference when, in fact, it has made a record. When it hasn't made a record, maybe there's no reason to give it deference. You're, you're correct, Justice Scalia. If there is no record, certainly there's by necessity no substantial evidence. And, and in that case, the compliance order would be. Breyer They, they might, they might change their, their system here if you, if you win this and provide for various kinds of pre-order procedure or post-order procedure where they'd be open to change. I, I see a number of possibilities. I just see the dilemma. Scalia They'll just issue warnings is what they'll do. Kennedy Are there cases in the courts of appeals or the district courts where landowners having received these notices or, or compliance orders have said that there's a taking of the property, inverse condemnation? I'm not aware of that, Your Honor, but, Justice Kennedy, but as this Court, I believe, held in Riverside Bayview, a, a takings claim under the Clean Water Act is not considered ripe until a permit application has been, has been attempted. Now, if a compliance order is issued, then the permit application might be off the table. And, in fact, one could see that a compliance order might potentially have a total taking effect in this case. But certainly at this point, we are willing to let EPA have the power. Yes, let EPA administer the act and issue compliance orders, but let's also give landowners a fair shake, too. Let them have their day in court to contest what the agency has done. Kagan Mr. Chief, I take it that the government agrees that there's not much of a chance that you could get an after-the-fact permit, but its view is you should have gotten a before-the-fact permit. And putting aside the weirdness, which Justice Alito points out, of making you go get a permit for something you don't think you need a permit for, putting that aside, couldn't you have gotten the legal determination that you wanted through that process? Verrilli, We, Justice Kagan, we don't deny that by applying for a permit and having the Court make a decision on the permit, that that's one way to get into court. But the difficulty for the Sacketts and for, you know, the thousands of folks in this country who are recipients of compliance orders is that that small or no solace once EPA has already acted, you know, once EPA has made the fining a violation and then threatens these ruinous penalties on landowners. Kagan Well, I think what EPA is saying is that as long as you knew that your lands were potentially wetlands, you could have gone in from the get-go and sought a determination that they were not wetlands through the permit process. Verrilli, That's correct, Justice Kagan. But frankly, the way EPA and the Court interpret the scope of their jurisdiction, that would make essentially every landowner in this country potentially on notice, requiring them to apply for a permit or some other manner, and the agency will then probably have even a worse situation. It will be flooded by permits. Roberts. Thank you, counsel. Counsel, the case is submitted.